**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **KEVIN MORGAN and TIMOTHY MORGAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:06-CV-337** |
| | ) | |
| **SNIDER HIGH SCHOOL, STEVEN** | ) | |
| **SIMMONS, JUDITH PLATZ, WENDY** | ) | |
| **ROBINSON, MARK BAILEY, MICHAEL** | ) | |
| **HAWLEY, and FORT WAYNE COMMUNITY** | ) | |
| **SCHOOLS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

### I. INTRODUCTION

Plaintiff Kevin Morgan ("Kevin") and his father Timothy Morgan ("Mr. Morgan") (collectively, "the Plaintiffs") bring this suit against Snider High School ("Snider") and Fort Wayne Community Schools ("FWCS"), and some of its employees, advancing various federal constitutional and state law claims arising from disciplinary proceedings instituted against Kevin for knowingly driving a fellow classmate who possessed marijuana onto school property.[1]

Defendants are seeking summary judgment on all of the Plaintiffs' claims, characterizing Plaintiffs' approach as a shotgun blast of constitutional and state law tort claims, none of which can withstand legal scrutiny. Although the Plaintiffs have apparently abandoned some of their claims, even those they actually pursue cannot withstand the Defendants' Motion for Summary

---

[1]For the sake of simplicity, Mr. Morgan's claims are treated as being derivative of Kevin's claims.

1

Judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

On September 29, 2004, Kevin drove two classmates (one of whom we shall refer to as "A.") to the Homecoming dance at Snider.  (Pls.' Mem. of Law in Supp. of Their Resp. to Defs.' Mot. for Summ. J. ("Resp. Br."), Expulsion Hr'g of Kevin Morgan ("Expulsion Hr'g") 3, 5-6.)  As Kevin traveled down Reed Road and turned onto Fairlawn Pass, approaching Snider's parking lot, he noticed that A. had a "bowl."[3]  (Expulsion Hr'g 5.)  A. asked Kevin's permission to smoke in the car and Kevin refused, pulled onto the school's property, and promptly had A. exit the car.  (Expulsion Hr'g 5.)  Kevin then parked the car in Snider's parking lot, and he and his other passenger proceeded to the dance.  (Expulsion Hr'g 5.)

Later, as A. entered the dance, Defendant Mark Bailey, Assistant Principal, detected the odor of marijuana on A.  (Expulsion Hr'g 3; Platz Aff. Ex. 15.)  An officer was notified and he approached A., discovering that A. smelled of marijuana and was under the influence.  (Expulsion Hr'g 3; Platz Aff. Ex. 15.)  After the officer's search of A.'s person yielded a bag of marijuana and drug paraphernalia, A. indicated that Kevin had driven him to the dance.  (Expulsion Hr'g 3.)  Defendant Michael Hawley, Snider's Athletic Director, knew who Kevin was and retrieved him for questioning.  (Bailey Dep. 9.)

When questioned, Kevin told Hawley that he had indeed dropped A. off at the dance.  (Kevin Dep. 65.)  Hawley explained to Kevin why he was summoned from the dance and

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Kevin and Mr. Morgan, the nonmoving parties.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[3] A "bowl" is slang "a marijuana smoking pipe."  *See* The Online Slang Dictionary, Definition of bowl, http://onlineslangdictionary.com/definition+of/bowl (last visited October 22, 2007).

informed him that the police and school officials wanted to search his car, to which Kevin

replied, "Okay."[4]  (Kevin Dep. 65-66, 74.)  Hawley and Bailey told Kevin that he could contact a

parent, but Kevin's attempts to do so proved unsuccessful.  (Kevin Dep. 66-67.)  The search of

Kevin's car proceeded.  (Kevin Dep. 67.)

Bailey and Fort Wayne Police Officer Crasper[5] climbed into the vehicle, but their initial

attempt to search was frustrated because neither had a flashlight.  (Bailey Dep. 4-25; Expulsion

Hr'g 8.)  They procured a flashlight and continued searching, leading to the discovery of a

marijuana seed and "siftings" in the area of the backseat.  (Simmons Dep. 11.)  According to

Defendant Steven Simmons, Principal of Snider, they did not collect the marijuana pieces

because there was not enough to even put in a "baggy."  (Simmons Dep. 11, 13.)

As the investigation unfolded, Officer Crasper and Simmons questioned Kevin about the

incident.  (Kevin Dep. 73-74.)  At some point Kevin was asked if he had smoked marijuana

within the last five days, to which he replied affirmatively; however, Simmons observed that

Kevin did not appear to be under the influence of any substance during the course of the

incident.[6]  (Expulsion Hr'g 9-10; Simmons Dep. 23.)

During the investigation, school officials called Kevin's mother Mary Morgan ("Ms.

---

[4]The Student Parking Permit Application Kevin had signed earlier in the school year provided that "[a]ny vehicle parked on the lot is subject to search in accordance with the search and seizure policies adopted by the Board of Trustees."  (Kevin Dep. 50-51 Ex. B.)

[5]While the officer's last name is also spelled in other ways throughout the record, including "Krasper" and "Crapser," we will refer to him as Office Crasper.

[6]At the expulsion hearing, Kevin explained that even though he had not actually smoked marijuana within the previous five days, he answered that he had because he was recently exposed to second-hand smoke, which he feared may cause a false positive on a drug test and land him in further trouble.  (Expulsion Hr'g 15-17.)  At the hearing, Kevin also submitted the negative results of a drug test taken shortly after the incident.  (Expulsion Hr'g 6-7.)

Morgan") and informed her that "Kevin brought somebody to school with drugs."  (Ms. Morgan Dep. 6.)  They explained the circumstances and requested that she come to pick up Kevin.  (Ms. Morgan Dep. 6-7.)  When she arrived, Bailey, Simmons, and another school official approached her and one of them told her that Kevin was "responsible for bringing a quantity of drugs to school."  (Ms. Morgan Dep. 9-10.)  According to Kevin, the officials then searched the car again while Ms. Morgan was present.  (Kevin Dep. 82.)

The day following the incident, Simmons suspended Kevin for five days and sought his expulsion for violation of a FWCS disciplinary rule that prohibits "[p]ossession . . . of illegal narcotics and drugs such as . . . marijuana . . . ."[7]  (Platz Aff. Ex. 1, Ex. 19 at 13.)

On October 6, 2004, one day prior to the expulsion hearing, Kevin's therapist, Dr. Rick Ritter of Stress Operations Group, Inc., sent a letter to Defendant Wendy Robinson, Superintendent of FWCS.[8]  (Robinson Dep. 24, Ex. 2.)  The letter stated that he had worked briefly with Kevin and affirmed that Kevin was not a drug abuser.  (Robinson Dep. Ex. 2.)  Ritter wrote, "[Kevin] is struggling with other emotional and psychological issues which are common for young men his age.  Nothing extraordinary or out of the ordinary."  (Robinson Dep. Ex. 2.)  Ritter further mentioned that he was "concerned that the manner in which [Kevin] has been treated and the way in which his parents are being treated is and will continue to exacerbate difficulties that need not be exacerbated."  (Robinson Dep. Ex. 2.)  Ritter's letter asked that the school personnel "look very carefully at the lessons that they are teaching young people and

_____

[7]Kevin's parking permit application also explained that students were proscribed from transporting any illicit drug to school, and that their failure to comply could lead to expulsion or arrest.  (Kevin Dep. 50-51 Ex. B.)

[8]Kevin's attorney also provided a copy of Ritter's letter to Platz at the Expulsion Hearing.  (Expulsion Hr'g 19.)

others . . . ." and added that he believed Kevin and his family should receive "a king size apology."  (Robinson Dep. Ex. 2.)  When Robinson received the letter, she forwarded it to Student Services, Assistant Superintendent Doug Coutts, and the school's legal counsel.  (Robinson Dep. 24.)

The expulsion hearing took place on October 7, 2004, with Defendant Judith Platz presiding.  (Platz Aff. Ex. 17.)  Kevin was represented by counsel at the hearing.  (*See generally* Expulsion Hr'g.)  The thrust of Kevin's argument at the hearing was that by the time he realized A. had marijuana, he was on a busy street, close to school, and he did not have a reasonable opportunity to eject A. from the car until they were on school grounds and safely out of traffic. (Expulsion Hr'g 10-15.)  Kevin implored the school not to expel him, explaining that at the time, he believed he was doing the right thing.  (Expulsion Hr'g 18.)  He added that he was willing to do community service or another program if the school so desired.  (Expulsion Hr'g 18.)

Platz rendered her determination on October 11, 2004, concluding that Kevin "knowingly drove a student that was in possession of marijuana onto school property."  (Platz Aff. Ex. 17.) She also found that although "marijuana seeds were found in his car . . . . [i]t is presumed the seeds were from the other student's marijuana."  (Platz Aff. Ex. 17.)  She further noted that Kevin was not under the influence and was cooperative with school officials.  (Platz Aff. Ex. 17.)  Finding that Kevin's actions constituted a violation of FWCS disciplinary Rule 31, she determined that he should return to school on "Level 5-E probation until the end of the second nine weeks on or about January 14, 2005."  (Platz Aff. Ex. 17.)

Platz then set forth the terms of Kevin's Probationary Agreement, which required that he and his parents meet with Bailey to discuss the terms of probation prior to returning to school,

that either his parents or the school bus transport him to school, that he not be truant or tardy, and that he achieve passing grades.  (Platz Aff. Ex. 17.)  Furthermore, and what appears most important from the Plaintiffs' point of view, Kevin, a swimmer on Snider's swim team, was prohibited from participating in or attending any extracurricular school activities during his probationary period.  (Platz Aff. Ex. 17.)

Instead of returning to Snider under these terms, Kevin enrolled at Bishop Dwenger High School ("Dwenger") on October 13, 2004.  (Tone Aff. ¶ 4.)  Since Kevin wished to continue his swimming career at Dwenger, under Indiana High School Athletic Association ("IHSAA") rules, Dwenger had to file a Transfer Report to make Kevin eligible to compete.  (Kevin Dep. at 22-23; Hawley Aff. ¶ 3.)  The report required that Snider's Athletic Director, Hawley, complete part of the form on behalf of the sending school.  (Hawley Aff. ¶ 3-4.)  Hawley recommended that Kevin only have limited eligibility under IHSAA Rule 19-6.2, meaning that Kevin could participate in athletics immediately, but not at the varsity level for 365 days from the date of his last participation in athletics at the sending school.  (Hawley Aff. ¶ 5, Ex. 1.)  In effect, Hawley's recommendation would have barred Kevin from competitive varsity swimming at Dwenger for the upcoming swim season.

Although Kevin was no longer enrolled at Snider, he appealed Platz's determination, which was upheld on intermediate appeal by Jerry White, Director of Student Services.  (Platz Aff. ¶ 7.)  Kevin next issued a notice of intent to appeal to the School Board.  (Platz Aff. ¶ 8.)  However, before the appeal proceeded any further, Coutts sent a letter to the Morgans stating, "[I]t was found that the determination . . . was based upon evidence not found in the record of Kevin's case.  Therefore, this proceeding is being administratively stopped."  (Coutts Dep. Ex.

6

3.)  Coutts then ordered that the incident be expunged from Kevin's record and directed Hawley to petition the IHSAA for unlimited eligibility for Kevin to compete.  (Coutts Dep. at 9-10; Hawley Aff. ¶ 6.)  Hawley completed a revised Transfer Report, requesting that Kevin receive a hardship exception.  (Hawley Aff. ¶ 6, Ex. 2.)  By November 24, 2004, prior to Dwenger's first swim meet, Kevin was eligible to participate in varsity swimming.  (Tone Aff. ¶ 7-8.)

Ultimately, Kevin completed his high school education at Dwenger and participated in varsity swimming there.  (Kevin Dep. 22-23.)  Dwenger did not punish or otherwise take action against Kevin for the incident at Snider, and Kevin's record does not reflect any disciplinary problems.  (Tone Aff. ¶ 8.)

Coutts now says that he administratively stopped the proceeding because he thought that Platz had improperly used information from another student to decide Kevin's case, and that besides, "the point was moot," since Kevin was no longer a student.  (Coutts Dep. 10, 12.)  Of course, if Coutts thought that his actions had brought the matter to a satisfactory end, he was undoubtedly surprised when the Plaintiffs filed their complaint on September 29, 2006.  (Docket # 1.)  In their Complaint, the Plaintiffs first utilize 42 U.S.C. § 1983 as a vehicle to raise due process violations under the Fourteenth Amendment of the United States Constitution, and then they recite a series of state law tort claims, such as negligence, arbitrary and capricious conduct, intentional and negligent infliction of emotional distress, and a violation of Kevin's right to an education without cost under Article VIII, § 1 of the Indiana Constitution.  (*See* Pl. Resp. ¶ 9.)  The Court will address all of these claims, some of which the Plaintiffs now appear to jettison; first, however, we will comment on the applicable legal standard.

### III.  STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge v. Am. Hoechst*, 24 F.3d 918, 920 (7th Cir. 1994).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted.  *Payne*, 337 F.3d at 770.  A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants."  *Id.*  However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial."  *Id.* at 771.

### IV.  DISCUSSION

#### A.  General Legal Principles Regarding School Discipline

With regard to school disciplinary matters, the U.S. Supreme Court cautions that "[i]t is not the role of the federal courts to set aside the decisions of school administrators which the court may view as lacking a basis in wisdom or compassion."  *Wood v. Strickland*, 420 U.S. 308, 326 (1975).  The Seventh Circuit Court of Appeals also has stressed that federal courts ought to "refrain [from] second-guessing the disciplinary decisions made by school administrators."  *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 825 (7th Cir.

2003) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 649 (1999)).  With these

overarching principles in mind, the Court now turns to the issues at hand.

### B.  The Plaintiffs' Abandoned Claims

By making no response to Defendants' arguments in the Motion for Summary Judgment,

the Plaintiffs have wisely abandoned a host of nonmeritorious legal claims.  The law is clear that

failure to respond to issues raised in a summary judgment motion constitutes waiver.  *See* Fed. R.

Civ. P. 56(e); *Gaerte v. Great Lakes Terminal & Transp. Corp.*, No. 3:05 CV 1141, 2007 WL

2461650, at *2 (N.D. Ind. Aug. 27, 2007) ("[I]ssues raised in [a] summary judgment motion that

non-moving party does not properly respond to are deemed waived[.]" (citing *E.E.O.C. v. U.S.

Bell*, No. 2:03 CV 237, 2005 WL 1683979, at *15 (N.D. Ind. July 19, 2005))); *see also Palmer v.

Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming a claim abandoned when a party

"failed to delineate his . . . claim in his district court brief in opposition to summary judgment ")

(citations omitted).

Therefore, the Plaintiffs have chosen not to defend, and thus have waived, the following

claims: that Simmons and Hawley violated Kevin's constitutional rights in their handling of the

vehicle searches, that Simmons violated Kevin's due process rights by suspending him, that

Hawley violated Kevin's due process rights through his communications with IHSAA, that the

FWCS disciplinary rules are unconstitutionally vague, that Defendants acted in an arbitrary and

capricious manner, and that Defendants violated Kevin's right to an education without charge

under Article VIII, § 1 of the Indiana Constitution.  As the Court will briefly discuss, even if not

waived, these claims fail on the merits.

<u>1.  Simmons and Bailey are not liable for any purported constitutional violations arising from the vehicle searches.</u>

The U.S. Supreme Court set forth the standards for searches of students and their property in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985).[9]  The Court concluded that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause . . . ." *T.L.O.*, 469 U.S. at 341. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.*  This is a two-step inquiry.  "[F]irst, one must consider 'whether the . . . action was justified at its inception . . . .'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).  "[S]econd, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place' . . . ." *Id.*  (quoting *Terry*, 392 U.S. at 20).

A search of a student is "'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated . . . either the law or the rules of the school." *Id.* at 341-42.  The Seventh Circuit Court of Appeals has interpreted "justified at its inception" to mean that there is "reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation." *Bridgman v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146, 1149 (7th Cir. 1997) (quotations and citation omitted).  A search is "permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age

---

[9]The standards for searches of student property set forth in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), extend to searches of student vehicles in school parking lots.  *See Anders ex rel. Anders v. Fort Wayne Cmty. Sch.*,124 F. Supp. 2d 618 (N.D. Ind. 2000).

and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342.

The searches of Kevin's vehicle were "justified at [their] inception" and "reasonably related in scope to the circumstances," *T.L.O.*, 469 U.S. at 341, as there was at least a reasonable suspicion that his car contained contraband, particularly so since Kevin admitted that he drove a student onto school property who was found to be under the influence and in possession of marijuana.  Moreover, the initial search was with Kevin's oral consent (as well as the prior consent derived from his parking permit application),[10] a status that presumably continued as the second search proceeded with a flashlight.  As to the alleged third search, it was conducted after some marijuana pieces were found in the car and after Kevin admitted that he had recently smoked marijuana, so clearly by then a more thorough search was reasonable.  Finally, while the Plaintiffs complain that the searches were conducted, or at least initiated, in the absence of Kevin's parents, they cite no authority that would suggest the searches were thus unconstitutional.

Accordingly, on this record, no reasonable juror could conclude that the search of Kevin's car by Bailey and Simmons was unconstitutional.

### 2.  Simmons did not violate Kevin's right to procedural due process in suspending him.

The Plaintiffs have also wisely surrendered a procedural due process claim against Simmons for his handling of Kevin's suspension.  The Fourteenth Amendment of the United States Constitution prohibits the Defendants and other state actors from depriving "any person of

---

[10]Kevin's prior consent to a vehicle search is implied through the terms of the school's parking permit application.  *See, e.g., Anders*, 124 F. Supp. 2d at 619, 620 (referring to a provision in a school parking permit application regarding submission to vehicle searches as a "implied consent policy").  *See also Anita J. v. Northfield Twp.-Glenbrook N. High Sch. Dist. 225*, No. 94 C 6480, 1994 WL 604100, at *1 n.2 (N.D. Ill. Nov. 4, 1994) (explaining that a student gave prior consent to a vehicle search through the school's parking registration policy that required students to consent to searches of their vehicles when parked on school property).

life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Due

process requires that Kevin receive notice and an opportunity to be heard – in the context of

school suspensions of ten days or less, this means "oral or written notice of the charges against

him and, if he denies them, an explanation of the evidence the authorities have and an

opportunity to explain his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975). Kevin

received oral notice of the charges when Simmons and Bailey explained the circumstances to

him and then to Mrs. Morgan. Even though Kevin did not deny the charge against him, he was

provided with an informal opportunity to be heard. *See id*. at 582 ("In the great majority of cases

the disciplinarian may informally discuss the alleged misconduct with the student minutes after it

has occurred. We hold only that, in being given an opportunity to explain his version of the facts

at this discussion, the student first be told what he is accused of doing and what the basis of the

accusation is."). Accordingly, Simmons did not commit any constitutional deprivation in

suspending Kevin.

### 3. Any ostensible claim against Hawley for a due process violation is meritless.

Any due process claim against Hawley concerning his first recommendation to the

IHSAA (i.e., that Kevin have limited athletic eligibility) is difficult to fathom since "'[a] student

has no constitutional right to participate in interscholastic athletics,'" *Ind. High Sch. Ass'n v.

Carlberg*, 694 N.E.2d 222, 242 (Ind. 1997) (internal quotation and citation omitted) (collecting

cases). Stated another way, Hawley's truthful communication to the IHSAA did not implicate a

liberty or property interest. *See also Huff v. Penn-Harris Madison Sch. Corp.*, No. 3:05-CV-

716RM, 2006 WL 2710596, at *3 (N.D. Ind. Sept. 18, 2006) (stating that Indiana has not

recognized a right to participation in school athletics). Moreover, the Plaintiffs seem to ignore

that Hawley subsequently obtained a hardship exemption for Kevin that ultimately allowed Kevin's full participation in varsity swimming at Dwenger.  Thus, the Plaintiffs' due process claim against Hawley is without merit.

       4.  The claim that the FWCS disciplinary rules are unconstitutionally vague also fails.

       The Plaintiffs' sweeping assertion that the FWCS disciplinary rules are unconstitutionally vague is difficult to address on its merits since they offered no argument.  Nevertheless, the vagueness inquiry focuses on "whether the law defines the proscribed conduct 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Wiemerslage v. Maine Twp. High Sch. Dist. 207*, 29 F.3d 1149, 1151-52 (7th Cir. 1994) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  Because the FWCS rules at issue implicate no constitutionally protected conduct (such as speech), a facial challenge of the rules for vagueness may succeed only if the rules are "impermissibly vague in all of [their] applications."  *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).  This means that to be vague, the rule must specify no standard of conduct at all.  *Id*. at 459 n.7 (citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).  In the context of school rules, "flexibility or breadth should not necessarily be confused for vagueness."  *Wiemerslage*, 29 F.3d at 1151.  "Given the peculiar issues facing school administrators, a school's disciplinary rules need not be drafted as narrowly or with the same precision as criminal statutes."  *Id*. at 1152 (citing *Linwood v. Bd. of Educ.*, 463 F.2d 763, 767 (7th Cir.)).

      The language of Rule 31 *explicitly prohibited* possession of marijuana on school property, and the parking permit application Kevin signed warned him that he was responsible

for the contents of his vehicle and was *specifically forbidden* from transporting illicit drugs to school.  Thus, the standard of conduct articulated by these rules is sufficiently definite.  Consequently, the Plaintiffs' claim that the FWCS's disciplinary rules are impermissibly vague is baseless.

     5.  The Plaintiffs' claim under state law that Defendants' actions were arbitrary and capricious is untimely and nonmeritorious.

The Plaintiffs' state law claim of arbitrary and capricious action is not only meritless, but also untimely.  A school board's "act of suspending or expelling a . . . student constitutes an administrative adjudication . . . ."  *Bouse v. Hipes*, 319 F. Supp. 515, 518 (S.D. Ind. 1970).  Pursuant to Indiana Code § 4-21.5-5-5, which sets forth the steps necessary to petition for judicial review of an agency action, "a petition for review is timely only if it is filed within thirty (30) days after the date that notice of the agency action that is the subject of the petition for judicial review was served."  Furthermore, under Indiana Code § 4-21.5-5-13(b), failure to file the agency record within thirty days after filing the petition, without an extension of time granted for good cause, "is cause for dismissal of the petition for review by the court . . . ."  Because the Plaintiffs failed to timely petition for review of their claim, at least after Coutts stopped the administrative review process, it is procedurally barred.[11]

Moreover, administrative actions are "arbitrary and capricious only where there is no reasonable basis for the action."  *S. Gibson Sch. Bd. v. Sollman*, 768 N.E.2d 437, 441 (Ind. 2002) (internal quotations and citations omitted).  The role of the courts is not to second-guess the decisions of school administrators, for "'[t]he system of public education . . . relies necessarily

---

[11]Of course, when Coutts administratively stopped the review, the Plaintiffs acquiesced and never advanced to the School Board, so there was never a final, reviewable agency action.  This circumstance suggests, alternatively, that any request for judicial review is moot.

14

upon the discretion and judgment of school administrators and school board members . . . .'" *Id.* (quoting *Wood*, 420 U.S. at 326). The Defendants had a reasonable basis for taking action against Kevin and placing him on probation given that he knowingly transported someone with drugs onto school grounds in contravention of the rules. Because such a reasonable basis exists, the Defendants' actions were not arbitrary and capricious; consequently, the Plaintiffs' state law claim of arbitrary and capricious action fails as a matter of law.

     <u>6. The claim under Article VIII, § 1 of the Indiana Constitution, pertaining to Kevin's right to an education without charge, lacks merit.</u>

     Finally, there is no claim in this context under Article VIII, § 1 of the Indiana Constitution because although education is a right under the Indiana Constitution, at least to the extent that it "shall be without charge, and equally open to all," the Plaintiffs do not suggest how that provision is implicated by anything the Defendants did or failed to do. Of course, the fact that Kevin ultimately attended a private school and incurred the cost of tuition was his and his parents' decision, not the Defendants', and one apparently motivated solely by their desire that Kevin be able to compete on a varsity swim team. Consequently, since no reasonable jury could find for the Plaintiffs on this claim, summary judgment is appropriate here as well.

     Having dispatched the Plaintiffs' abandoned claims, we will now turn to the claims the Plaintiffs actually advanced in response to the Defendants' Motion for Summary Judgment.

**C.  The Plaintiffs' Remaining Substantive Due Process Claims**

     First, the Plaintiffs seem to make a substantive due process claim arising out of the alleged failure of Simmons and Bailey to take possession of the marijuana found in Kevin's car, which allegedly led to its subsequent absence at the expulsion hearing. They also complain that Platz improperly used evidence from another proceeding to support Kevin's adjudication, and

finally, they charge Superintendent Robinson with having disregarded Ritter's letter.  None of these purported substantive due process claims have merit.

At its heart, substantive due process is about protecting "'the individual against arbitrary action of government.'"  *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).  However, "the scope of substantive due process is very limited."  *Id*. (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)).  Substantive due process applies to "the exercise of governmental power without reasonable justification," *id*. (citing *Dunn v. Fairfield Cmty. High Sch., Dist. No. 225*, 158 F.3d 962, 965 (7th Cir. 1998)), and encompasses governmental action that rises to an abuse of power such that it "'shocks the conscience,'" *id*. (quoting *Rochlin v. California*, 342 U.S. 165, 172 (1952)).  "It is one thing to say that officials acted badly, even tortiously, but – and this is the essential point – it is quite another to say that their actions rise to the level of a constitutional violation."  *Id*. at 903.

1.  The substantive due process claims against Simmons and Bailey regarding their failure to preserve the contraband found in Kevin's car cannot prevail.

To begin, the substantive due process claims against Simmons and Bailey center on their alleged failure to take "continuity" of the drugs and Simmons's institution of expulsion proceedings without preserving or presenting the contraband.  These incidents, however, do not give rise to a substantive due process claim.

To explain, it seems utterly immaterial whether the school officials preserved the marijuana "siftings," given that it was undisputed at the Expulsion Hearing that some marijuana was present in Kevin's vehicle.  In addition, the Defendants did not allege, or at least it was not found, that the marijuana was Kevin's, (Platz Aff. Ex. 17 ("It is presumed the seeds were from the other student's marijuana.")), only that Kevin had transported a student who possessed

marijuana onto school property, an infraction Kevin readily admitted to at the scene.  (Kevin Dep. 65, 74.)  Indeed, at the Expulsion Hearing, Kevin conceded that A. had marijuana and that he transported him onto school grounds.  (Expulsion Hr'g at 5.)  Consequently, the action or inaction of the school officials related to preserving the marijuana hardly "shocks the conscience."  *Tun*, 398 F.3d at 902.

Moreover, Kevin's concession that he knowingly transported a student with marijuana onto school grounds, a clear violation of the FWCS disciplinary rules, reasonably justified the institution of disciplinary proceedings.  *Id*.  It is not the role of the Court to question what the Plaintiffs see as a lack of compassion, *Wood*, 420 U.S. at 326, or to second-guess the disciplinary decision of the school's administrators, *Gabrielle M.*, 315 F.3d at 825.  Rather, the burden is on the Plaintiffs to establish that Defendants' actions were without reasonable justification, *Tun*, 398 F.3d at 902, and to such a degree that it "shock[s] the conscience," *Rochlin*, 342 U.S. at 172. At most, the Plaintiffs established that the Defendants have zero tolerance towards, and will seek the expulsion of, anyone introducing, or aiding in the introduction of, narcotics onto school property, an attitude that is hardly "without reasonable justification," or that "shocks the conscience."  *Tun*, 398 F.3d at 902.

Finally, the Plaintiffs have failed to show that the alleged constitutional rights at issue were clearly established, *see Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007), a critical point given that both Simmons and Bailey assert qualified immunity.[12]

---

[12]Although each of the individual Defendants sued by the Plaintiffs argue that they are entitled to qualified immunity for their actions, the Plaintiffs do little, if anything, to rebut that argument.  In any event, because there was no constitutional violation here, the Court has not deemed it necessary to proceed to the second step of the qualified immunity analysis; that is, whether the constitutional rights that were allegedly violated were clearly established at the time of the alleged violations.  *Tun*, 398 F.3d at 902 (*citing Saucier v. Katz*, 533 U.S. 194 (2002)). As we have discussed, however, even if the Court somehow found a constitutional violation, the case law probably

Therefore, the Plaintiffs' substantive due process claims against Simmons and Bailey are unsuccessful.

### 2.  The substantive due process claim against Platz is defeated.

Next, the Plaintiffs claim that Platz erroneously relied on inappropriate information in deciding Kevin's case.  Their claim, however, is unsupported in the record.

To explain, the record does not reflect what information outside the record Platz considered; indeed, her Written Summary of the Evidence only recites facts the parties presented during the Expulsion Hearing.  (Platz. Aff. Ex. 17.)  Furthermore, Platz's decision to impose probation did not deprive Kevin of any cognizable liberty or property interest as a matter of law since there is no property interest in extra-curricular sports.  *Carlberg*, 694 N.E.2d at 242; *Huff*, 2006 WL 2710596, at *3.  Stated simply, Platz's decision that Kevin return to school on probation did not constitute an abuse of power that shocks the conscience.[13]  Moreover, Platz is entitled to qualified immunity.  *See supra* note 12 and accompanying text.

----

reassured the Defendants that they were on solid legal footing, and thus they are entitled to qualified immunity.  *Id.* at 904.

[13]It would appear that if the Plaintiffs are advancing a procedural due process claim against Platz, or any of the Defendants, it too has been waived. *Gaerte*, 2007 WL 2461650, at *2; *see also Palmer*, 327 F.3d at 597-98. Furthermore, all that procedural due process requires is notice of the charges, notice of the time of the hearing, and a full opportunity to be heard.  *Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1010-11 (7th Cir. 2002).  Kevin articulates no basis or suggestion how the defendants failed to provide him with due process, particularly since he was not entitled to "a judicial or quasi-judicial trial."  *Id.* at 1010.  Accordingly, to the extent a procedural due process claim exists, summary judgment will be granted in favor of the Defendants.

In addition, the Plaintiffs in their Response Brief invoke, in passing, the Equal Protection Clause of the United States Constitution.  (Resp. Br. at 2).  "An equal protection violation occurs only when different legal standards are arbitrarily applied to similarly situated individuals."  *Wagner ex.rel. Wagner-Garay v. Fort Wayne Cmty. Sch.*, 255 F. Supp. 2d 915, 928 (N.D. Ind. 2003) (citing *Smith v. Severn*, 129 F.3d 419, 429 (7th Cir. 1997)). The Plaintiffs, however, make no mention of how the treatment Kevin received from any of the Defendants was any different than that accorded to other similarly situated students.  Summary judgment is therefore appropriate on this purported claim.

3.  The individual capacity claims of substantive due process and supervisory liability asserted against Superintendent Robinson also fail.

Finally, the Plaintiffs allege that the failure by Defendants, and principally Robinson, to consider Ritter's letter gives rise to a substantive due process claim.  The argument is not really developed in the Plaintiffs' Response Brief, probably because the record does not reflect that Robinson or anyone else disregarded the letter.  In fact, when Robinson received the letter, she immediately passed it down the administrative chain to Student Services, Coutts, and legal counsel.  (Robinson Dep. 24.)  We do not believe that any reasonable jury could conclude that this action was "without reasonable justification," or that if it was, that it "shocks the conscience."  *Tun*, 398 F.3d at 902.

Of course, aside from the substantive due process claim, the Plaintiffs might also be alleging that Robinson is liable in her individual capacity as a supervisor.  However,"[t]he doctrine of *respondeat superior* cannot be used to impose § 1983 liability on a supervisor for the conduct of a subordinate violating a plaintiff's constitutional rights."  *Lanigan v. Vill. of E. Hazel Crest,Ill.*, 110 F.3d 467, 477 (7th Cir. 1997) (citations omitted).  For Robinson to incur liability under § 1983 for the acts of her subordinates, she "must be personally involved in that conduct."  *Id.* (citations omitted).  "[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under section 1983.  Gross negligence is not enough either."  *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (internal citations omitted).  "The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.  They must in other words act either knowingly or with deliberate, reckless indifference."  *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (citing *Jones*, 856 F.2d at 992-93).

19

To begin, aside from the lack of any apparent constitutional violation, there is no showing that Robinson was even aware of either the incident at Snider while it was unfolding or the subsequent Expulsion Hearing.[14]  In fact, the only act that Robinson seemingly may have taken prior to the Expulsion Hearing was sharing Ritter's letter with Student Services, Coutts, and legal counsel, which can hardly be characterized as facilitating, approving, condoning, or turning a blind eye to unconstitutional conduct.  *See Jones*, 856 F.2d at 992-93.  Likewise, while Robinson did state at her deposition that at some point she met with the Morgans at their request to address their grievances, (Robinson Dep. 34), this is hardly turning a blind eye to the alleged deprivation or acting with deliberate or reckless indifference.  *See id.*

Consequently, summary judgment will be granted to Robinson with respect to the substantive due process and supervisory liability claims asserted against her in her individual capacity.  Moreover, on this record, Robinson is likewise entitled to qualified immunity.  *See supra* note 12 and accompanying text.

### D.  The Official Capacity Claim

The Plaintiffs make a claim of official capacity against FWCS[15] and the other Defendants, presumably arising from the search of Kevin's vehicle and the handling of Ritter's correspondence.  Although their reasoning is not clearly stated, the Plaintiffs apparently suggest that "[S]uperintendent Robinson became a decision-making person with authority as did Platz,

[14]Although in their Response Brief the Plaintiffs state that Robinson was "personally involved in the investigation . . . and the appeal process" and that "[t]here is undisputed evidence that Superintendent Robinson initiated the investigation of Kevin Morgan's expulsion hearing prior to the Appeal process itself started (sic)," they fail to support this assertion with a citation from the record to support it, nor do they explain which of Robinson's acts they are referring to or provide any details about what she allegedly did. Such a skeletal claim is insufficient to paint a picture of Robinson's alleged personal involvement.

[15]Although Plaintiffs named Snider as a Defendant, Snider has no legal status independent of FWCS, *see* Ind. Code § 20-26-5-4, and we will therefore ignore the misnomer.

Simmons, Bailey, and Coutts." (Resp. Br. at 5.) We now address these claims in turn and explain why each is ultimately doomed.

"*Monell v. Department of Social Services*, 436 U.S. 658, 690, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), holds that the doctrine of respondeat superior may not be used to fasten liability on a local government in a suit under section 1983." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001); *see also Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir. 1993). Under § 1983, a municipality can only be liable for acts taken pursuant to its official policy, statement, ordinance, regulation or decision, or those taken pursuant to a municipal custom. *Monell*, 436 U.S. at 690-91.

A "custom" or "policy" that is unconstitutional and invokes municipal liability under § 1983 may manifest in one of three ways: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004) (citing *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003)). A plaintiff seeking to establish municipal liability must also show that enforcement of the policy was the "moving force" behind the constitutional violation. *Cornfield*, 991 F.2d at 1324 (citation omitted). "There must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Lanigan*, 110 F.3d at 479 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

The Plaintiffs, however, rely solely on the third proposition, "that the district itself, which

is to say the officials or official boards that constitute the relevant final decisionmaking authority . . . within the district, was directly responsible for the deprivation." *Gernetzke*, 274 F.3d at 468 (citing *McMillian v. Monroe County*, 520 U.S. 781, 784-85 (1997); *Horwitz v. Bd. of Educ.*, 260 F.3d 602, 619 (7th Cir. 2001); *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998)). This means that the Plaintiffs must establish that "the actor, . . . the decisionmaker – was at the apex of authority for the action in question." *Gernetzke*, 274 F.3d at 468 (citing *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995)). Whether an actor has final policymaking authority is a question of state law. *Oliver v. McClung*, 919 F. Supp. 1206, 1214 (N.D. Ind. 1995).

As a matter of law, Platz, Simmons, Bailey, and Hawley were not "at the apex of authority for the action in question." *Gernetzke*, 274 F.3d at 468. We know this to be true because under Indiana law, Simmons, as Principal, was not a final decisionmaker; correspondingly, all those in lesser decision-making roles (i.e. Hawley and Bailey) also cannot create liabilities for FWCS. *Oliver*, 919 F. Supp. at 1216 (holding that Indiana school principals have not been delegated final decision-making authority). Likewise, Platz is not in a position of final policymaking authority, as her determination was ultimately overturned by Coutts.

This leaves the Plaintiffs with the assertion that Robinson was "at the apex of authority," *Gernetzke*, 274 F.3d at 468, concerning Kevin's suspension and probation. However, this claim must fail as well. "[C]ases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority." *Id.* 3d at 469 (citations omitted). Of course, as determined earlier, Robinson did not commit an act amounting to an unconstitutional deprivation, but even beyond that, Robinson, as FWCS's superintendent, is not the final

policymaker for school discipline under Indiana law; that role resides exclusively with the

School Board.  *See* Ind. Code § 20-33-8-19 (granting the school corporation's governing body

the authority to review an appeal on an expulsion determination, hold a meeting to consider the

evidence, and "take action that the governing body finds appropriate"); *Oliver*, 919 F. Supp. at

1216 (finding that in Indiana, final policymaking power lies with the School Board as the

governing body).  For this reason, Coutts cannot be deemed a FWCS policymaker either.  Thus,

because the Plaintiffs failed to demonstrate any basis for municipal liability against FWCS under

§ 1983, summary judgment will be granted on this claim.

### E.   The Plaintiffs' State Law Claims[16]

Having waived most of their state law claims, the Plaintiffs still maintain that they have

claims for the negligent and intentional infliction of emotional distress arising from Kevin's

exposure to FWCS's disciplinary proceeding, as well as a negligence claim against

Superintendent Robinson for her purported disregard of Ritter's correspondence.  Those claims,

however, are ultimately unsuccessful because they not only fail on the merits, but also because

the individual Defendants are immune from liability in this instance under the Indiana Tort

Claims Act.

At the outset, the Plaintiffs' claims against the individual defendants fail as a matter of

law because there is no genuine issue of material fact that would even raise the inference that

they were acting outside the scope of their employment.  *Tun*, 326 F. Supp. 2d at 939.

Therefore, any claim against them individually for negligence, as opposed to FWCS, is barred,

---

[16]The Court could dismiss the Plaintiffs' remaining supplemental jurisdiction claims under 28 U.S.C. § 1367(c)(3), but since they are clearly meritless, the Court will address them so this litigation comes to a complete end.

*see* Ind. Code § 34-13-3-5(a), and the Plaintiffs do not assert otherwise. *Id.* at 939-40.

What is more, the Plaintiffs cannot establish that liability exists on the merits with respect to their tort claims against FWCS.

<u>1.  The emotional distress claims fail as a matter of law.</u>

*(a) Intentional Infliction of Emotional Distress*

To make out an intentional infliction of emotional distress claim, Kevin must show that the Defendants "by extreme and outrageous conduct intentionally or recklessly cause[d] [him] severe emotional distress . . . ." *Seiwert v. Spencer-Owen Cmty. Sch. Corp.,* 497 F. Supp. 942, 956-57 (S.D. Ind. 2007) (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)).  Clearly, the standard is a rigorous one, as underscored by Indiana's adoption of Section 46 of the Restatement (Second) of Torts, *Lachenman v. Stice*, 838 N.E.2d 451, 456-57 (Ind. Ct. App. 2005), which offers the following narrative of what is required to prove such claims:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous.  It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Indiana state courts have interpreted this guidance as requiring some showing on the part of the plaintiff that the conduct alleged "exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind." *Seiwert*, 497 F. Supp. 2d. at 957 (citing *Lachenman*, 838 N.E.2d at 457).

24

Here, the Plaintiffs argue that Kevin was present for the expulsion hearing and that because Platz and other school authorities were influenced by some sort of extrinsic evidence, Kevin experienced something they loosely describe as enhanced personal trauma.  (Resp. Br. at 5.)  However, this argument is a far cry from the type of extreme and outrageous conduct that is required to support a claim for the intentional infliction of emotional distress.  Certainly there is nothing that would allow the average member of the community, or the average juror for that matter, to find that the conduct here was "beyond all possible bounds of decency, . . . [or] atrocious" such that it was "utterly intolerable in a civilized community."  *Seiwert*, 497 F. Supp. 2d. at 957.  Finally, there is no evidence presented to support a reasonable inference that any of the Defendants intended to inflict emotional distress upon Kevin.  *Id.*  Consequently, the Defendants' Motion for Summary Judgment will be granted on this claim.

*(b) Negligent Infliction of Emotional Distress*

The Plaintiffs assert, but not too forcefully, that the same facts that support an intentional infliction of emotional distress claim also make out a claim for the negligent infliction of emotional distress.  The Defendants maintain that Kevin cannot make out a claim for the negligent infliction of emotional distress because he cannot show that he suffered the necessary predicate, "direct impact" as required by Indiana law.  (*See* Reply Br. at 6 (citing *Smith v. Toney*, 862 N.E. 2d 656, 659 (Ind. 2007)).

The rule in the state of Indiana for when a claim of negligent infliction of emotional distress can be established has evolved to become what has been called "the modified impact rule," but throughout that evolution, the Indiana Supreme Court has emphasized that the plaintiff must at least have sustained some "direct physical impact."  *Atl. Coast Airlines v. Cook*, 857

25

N.E.2d 989, 991 (Ind. 2006) ("In an action to recover damages for the negligent infliction of emotional distress, Indiana's modified impact rule requires a claimant to demonstrate a direct physical impact resulting from the negligence of another."); *Conder v. Wood*, 716 N.E.2d 432, 435 (Ind. 1999).  Since Kevin does not allege any physical impact, there can be no claim for the negligent infliction of emotional distress against any of the Defendants as a matter of law.

    2.  The negligence claim against Robinson also lacks merit.

    The Plaintiffs maintain that Robinson was negligent for allegedly disregarding Ritter's correspondence given that she had a duty to take into account the concerns of Kevin's mental healthcare provider in connection with the ongoing disciplinary proceeding.

    Robinson does not maintain that she had no duty to Kevin, but rather maintains that whatever duty she may have had was fulfilled when she forwarded Ritter's unsolicited letter to Student Services, Coutts, and legal counsel.  In short, Robinson contends that she exercised ordinary and reasonable care by forwarding Ritter's rather benign letter (benign, except for its tone of advocacy) to those who would most likely need to address it.

    In order to make out an Indiana common law claim of negligence, Kevin must establish the following elements: "(1) a duty owed to plaintiff by defendant, (2) breach of duty by allowing conduct to fall below the applicable standard of care, and (3) a compensable injury proximately caused by defendant's breach of duty." *Pisciotta v. Old Nat. Bancorp*, No. 06-3817, 2007 WL 2389770, at *4 (7th Cir. Aug. 23, 2007) (citing *Bader v. Johnson*, 732 N.E.2d 1212, 1216-17 (Ind. 2000)).

    As to the first element, school personnel have a duty to exercise ordinary and reasonable care for the safety of the children under their authority.  *Beckett v. Clinton Prairie Sch. Corp*.,

26

504 N.E.2d 552, 553-54 (Ind. 1987) (citing *Miller v. Griesel*, 308 N.E.2d 701 (Ind. 1974));

*Norman v. Turkey Run Cmty. Sch. Corp*., N.E.2d 614 (Ind. 1980)).

However, teachers and schools are not insurers of pupil safety, nor are they strictly liable for any injuries that may occur to a student; rather, the conduct of school officials will be legally assessed by determining whether they exercised their duty with the level of care of an ordinarily prudent person under the same or similar circumstances.  *Id.*  This factual determination is generally a jury question.

Kevin never really tells us what he thinks Robinson should have done in addition to the action taken by her, particularly since it is apparent that Ritter's letter was present at the expulsion hearing and apparently considered.  While this indisputable fact also suggests that any alleged negligence on the part of Robinson could not form the basis for proximately causing Kevin's alleged injuries, we also do not think that any jury could find that Robinson failed to exercise ordinary and reasonable care, either individually or as an agent of FWCS, by promptly dispatching Ritter's letter to those subordinates most likely overseeing Kevin's disciplinary proceedings.[17]  In fact, we know Robinson's routing of the letter was appropriate because she sent it to Coutts, and he ultimately was the one to intervene to address many of the Plaintiffs' issues.  Consequently, the Defendants' Motion for Summary Judgment on the Plaintiffs' negligence claim will be granted.

---

[17]When this event occurred, Robinson was Superintendent for a school corporation that had over 31,000 students.  Ind. Dep't of Educ., Indiana Accountability System for Academic Progress, School Data on Enrollment for Fort Wayne Community Schools, http://mustang.doe.state.in.us/TRENDS/corpenr.cfm?corp=0235&var=enr (last visited October 22, 2007).  We do not think it was unreasonable for a Superintendent of a large metropolitan school corporation to refer a letter concerning one student to those school officials presumably in the best position to handle such issues.

**CONCLUSION**

The Plaintiffs' scattershot effort to pin some sort of liability on these Defendants ultimately fails as a matter of law; stated simply, whether abandoned or not, the Plaintiffs' claims are meritless.  Accordingly, for the reasons set forth, the Defendants' Motion for Summary Judgment is GRANTED and the Clerk is directed to enter judgment in favor of the Defendants and against the Plaintiffs.

SO ORDERED.

Enter for this 23rd day of October, 2007.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

28